# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Andre Fletcher,               :
            Petitioner      :
                      :
        v.              :   No. 533 C.D. 2021
                      :   Submitted: April 14, 2022
Unemployment Compensation   :
Board of Review,          :
           Respondent   :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**     **FILED: October 4, 2022**

Andre Fletcher (Claimant) petitions for review of a March 11, 2021 Order of the Unemployment Compensation (UC) Board of Review (Board), affirming the decision of a Referee that found Claimant ineligible for UC benefits pursuant to Section 402(e) of the Unemployment Compensation Law (Law)[1] because Claimant was discharged for willful misconduct. Having reviewed the record and the law, we conclude substantial evidence exists to support the Board's findings and discern no error of law in its conclusions. Therefore, we affirm.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e).

After being discharged from his employment with Inframark, LLC (Employer), Claimant filed an application for benefits on July 17, 2020, citing unsatisfactory work performance as the reason for his discharge. (Certified Record (C.R.) at 007-08.) On Claimant's application, he answered "no" in response to the question: "[w]ere you discharged or suspended as a result of a rule violation[.]" Claimant also answered "yes" to the questions: "[w]as your work performance below company standards," and "[w]ere you warned about your work performance[.]" (*Id.* at 008-09.) A local UC Service Center found Claimant eligible for benefits because Employer failed to show that "[C]laimant was not working to the best of his ability." (Notice of Determination, C.R. at 018.) Employer appealed on September 30, 2020, and a telephonic hearing was held before a Referee, at which Claimant testified on his own behalf, and Michael Wolgemuth (Regional Manager) testified on behalf of Employer.[2] Following the hearing, the Referee issued a decision that reversed the Service Center's determination and made the following findings of fact:

1. The [C]laimant was last employed as a full-time Project Manager with [Employer] earning $40.78 per hour. The [C]laimant began employment June 12, 1995[,] and last worked on July 16, 2020.

2. For 21 years, the [C]laimant was employed as an operator at a wastewater plant for the [E]mployer.

---

[2] Regional Manager held that position for the three years Claimant was Project Manager at Employer's Downingtown facility. (C.R. at 058.) Also present at the hearing on behalf of Employer was Stephanie Taylor, Employer's Senior Human Resources Business Partner. (*Id.* at 049.) However, all relevant questions were addressed to and answered by Regional Manager. (*Id.*) The Referee and Board did not consider any testimony of Ms. Taylor in reaching their findings.

3. The [C]laimant became the Project Manager of the Downingtown facility in the last four years of his employment.

4. As the Project Manager, the [C]laimant was responsible for overseeing the operations of the facility and in part managing staff to comply with the parameters of permits issued.

5. All wastewater plants that discharge into receiving water must receive an NPDES[3] permit from the Environmental Protection Agency (EPA).

6. Pursuant to the NPDES permit, the maximum chlorine residual permitted was 1.6 mg/L.

7. As the Project Manager, the [C]laimant was responsible for training staff to handle or address a high flow event at the plant.

8. The [C]laimant was responsible for installing an alarm which was monitored online to alert the operators at the plant if the maximum chlorine residual limit was exceeded.

9. The alarm should have been set in accordance with the maximum chlorine residual permitted which was 1.6 mg/L.

10. The [C]laimant delegated the task of setting the alarm to the [a]ssistant [m]anager,[4] who set the alarm to 3.5 mg/L.

11. The [C]laimant inspected the alarm and was aware the alarm was set to 3.5 mg/L.

12. On April 13, 2020, a high flow [event] occurred at the facility wherein the operators opened a valve to diverge flow to a spare clarifier which caused an overdose of chlorine.

---

[3] NPDES stands for National Pollutant Discharge Elimination System, and an NPDES permit is issued to "each wastewater plant that discharge[s] into a receiving stream." (C.R. at 053-054.)

[4] It is not entirely clear from the record whether there was more than one assistant manager. The Court will refer to there being only one because that is what the Referee's findings and the Board's Order indicate.

13. The [E]mployer investigated the incident and determined the operators were not properly trained and the [C]laimant did not institute a Standard Operating Procedure for the plant to address this type of incident.

14. The [C]laimant did not institute a Standard Operating Procedure to address the type of incident which occurred on April 13, 2020[,] because the incident was unique and had not happened during the course of the [C]laimant's 25-year employment.

15. After the April 13, 2020 incident, the [C]laimant spoke to the Regional Manager who informed the [C]laimant although the [C]laimant was relying on the [a]ssistant [m]anager to handle the operators during the incident, ultimately, the [C]laimant was responsible for what occurred at the facility.

16. On June 12, 2020[,] an upset of the biological process occurred at the facility which caused the maximum chlorine residual limit to be exceeded.

17. [The] June 12, 2020 incident occurred, in part, because the alarms were set in excess of the maximum chlorine residual limit permitted.

18. The [C]laimant was aware the alarm was set in excess of the maximum chlorine residual limit permitted at the time this incident occurred.

19. On July 10, 2020, a high flow incident occurred at the facility due to a rain event which caused the maximum chlorine residual to exceed 1.6 mg/L.

20. The [C]laimant was on site July 10, 2020, and did not closely supervise the operators, but delegated that responsibility to the [a]ssistant [m]anager.

21. The [C]laimant continued to delegate responsibility for monitoring the operators to the [a]ssistant [m]anager because he trusted them [sic] to handle the responsibility.

22. At some point during the [C]laimant's employment as a Project Manager, the [E]mployer assigned the [C]laimant to a second facility.

4

23. After the [C]laimant was assigned to a second facility, the [E]mployer observed the [C]laimant was not performing his duties in a satisfactory manner.

24. In February 2020, the [C]laimant was removed as the Project Manager at the second facility.

25. The [C]laimant's performance as a Project Manager improved between February 2020 and April 2020.

26. At some point, the [C]laimant received a written warning, in part, for unsatisfactory work performance.

27. After the July 10, 2020 incident, the [C]laimant was discharged from employment on July 16, 2020 for unsatisfactory work performance.

(Referee's Decision, Findings of Fact (FOF) ¶¶ 1-27, C.R. at 076-078.) Based on these findings, the Referee concluded that "[E]mployer has met its burden of proof in establishing the [C]laimant's discharge from employment was for reasons which rise to the level of willful misconduct in connection with the work[.]" (Referee's Decision at 4, C.R. at 079.) The Referee explained that "[C]laimant's decision to continue to delegate . . . to the [a]ssistant [m]anager, despite the previous incidents and the [C]laimant's determination that the [a]ssistant [m]anager was not performing satisfactorily shows a deliberate disregard of the standard of behavior the [E]mployer had the right to expect." (*Id.*)

Claimant appealed to the Board, which affirmed, adopting and incorporating the Referee's findings and conclusions, as modified, into its Order. The Board modified Finding of Fact 7 to state that, in Claimant's role as Project Manager, he was "responsible for training staff to handle or address a high flow event and to maintain compliance with the NPDES permitting requirements[.]" (Board's Order, C.R. at 101.) The Board also added Finding of Fact 10(a), which states that

5

"[C]laimant was in charge of managing the plant and overseeing the assistant manager['s] work performance, including any issues therewith." (*Id.*) Lastly, the Board modified Finding of Fact 27 to state "[O]n July 16, 2020, [E]mployer discharged the [C]laimant from his employment for unsatisfactory work performance relative to the three NPDES permit violations, despite counseling and coaching sessions, additional training, and being placed on a 'success plan.'" (*Id.*) The Board noted that "[w]hile . . . [C]laimant asserted that it was the [E]mployer's responsibility to discipline the assistant manager after the NPDES violations, . . . [C]laimant continued to delegate authority to the assistant manager." (*Id.*) Claimant also "acknowledged that it was his job to manage operations and ensure NPDES compliance." (*Id.*) "Thus, the fact that . . . [C]laimant continued to allow the assistant manager to manage the high-flow events without additional oversight is behavior which falls below the standard of conduct that an employer has the right to expect of employees." (*Id.*) Claimant now petitions for review of the Board's Order.

On appeal, Claimant asserts the Board's determinations were not supported by substantial evidence of record, and/or that it committed errors of law in affirming. Claimant more specifically challenges the Board's finding that Claimant's delegation of duties, including monitoring alarms and levels, to assistant manager amounted to willful misconduct. Further, Claimant challenges the Board's determination that he did not have good cause to delegate his duties and set the alarms in excess of the maximum permitted level.

Preliminarily, we note that our scope of review is limited to determining "whether constitutional rights were violated," whether an error of law was committed, or whether necessary findings of fact were supported by substantial

6

evidence. *Johns v. Unemployment Comp. Bd. of Rev.*, 87 A.3d 1006, 1009 n.2 (Pa. Cmwlth. 2014). On appeal, the Board's findings are conclusive "so long as the record taken as a whole contains substantial evidence to support them." *Henderson v. Unemployment Comp. Bd. of Rev.*, 77 A.3d 699, 718 (Pa. Cmwlth. 2013). "Substantial evidence is defined as relevant evidence upon which a reasonable mind could base a conclusion." *Id.* "In determining whether there is substantial evidence to support the Board's findings, this Court must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence." *Id.* "It is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made." *Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Rev.*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008). Finally, it bears emphasis that "the Board is the ultimate fact-finder in [UC] matters and is empowered to resolve all conflicts in evidence, witness credibility, and weight accorded the evidence." *Id.*

At issue here is whether Claimant's actions constituted willful misconduct. Section 402(e) of the Law provides that a claimant is ineligible for benefits for any week "[i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work." 43 P.S. § 802(e). Although "willful misconduct" is not defined in the Law, our Supreme Court has held that the term means:

> a) wanton or willful disregard for an employer's interests; b) deliberate violation of an employer's rules; c) disregard for standards of behavior which an employer can rightfully expect of an employee; or d) negligence indicating an intentional disregard of the employer's interest or an employee's duties or obligations.

7

*Navickas v. Unemployment Comp. Rev. Bd.*, 787 A.2d 284, 288 (Pa. 2001) (quoting *Caterpillar, Inc. v. Unemployment Comp. Bd. of Rev.*, 703 A.2d 452, 456 (Pa. 1997)). "Mere incompetence, inexperience or inability of an employee, while it may justify a discharge[,] will not constitute willful misconduct so as to render an employee ineligible for unemployment compensation." *McCrea v. Unemployment Comp. Bd. of Rev.*, 487 A.2d 69, 70 (Pa. Cmwlth. 1985) (quoting *Sacks v. Unemployment Comp. Bd. of Rev.*, 459 A.2d 461, 463 (Pa. Cmwlth. 1983)).

"[W]illful misconduct is established when action or inaction by [a c]laimant amounts to a conscious disregard of the employer's interests or constitutes behavior contrary to which an employer has a right to expect from an employee." *McCrea*, 487 A.2d at 71 (citing *Gardner v. Unemployment Comp. Bd. of Rev.*, 454 A.2d 1208, 1209 (Pa. Cmwlth. 1983)). An employer bears the burden of proving that a claimant engaged in willful misconduct. *McLean v. Unemployment Comp. Bd. of Rev.*, 383 A.2d 533, 535 (Pa. 1978). "The question of whether or not an employee's actions constitute wil[l]ful misconduct is a question of law, subject to our review," and "[t]he determination must be made in light of all the circumstances." *Id.* (internal citations omitted).

With the above principles in mind, we turn to this case. Claimant maintains that the Board's finding that he engaged in willful misconduct is not supported by substantial evidence and constituted legal error because there was a "need for delegation" and there was no policy or rule prohibiting Claimant from delegating tasks, including the monitoring of alarms and levels, to the assistant manager. (Claimant's Brief (Br.) at 11.) Claimant relies heavily on the absence of evidence that Employer had a rule or policy that prevented the delegation of tasks to the

assistant manager. (*Id.* at 14, 17-18.) However, a violation of an employer rule or policy is not the basis on which the Board found Claimant ineligible for benefits. A review of the Referee's Decision and Board's Order reflects that there are no findings of fact or conclusions of law indicating that Claimant's delegation of tasks to the assistant manager was a violation of Employer's rules or policies. We also note that, contrary to Claimant's arguments on appeal, Claimant responded "no" in response to the question on his UC application for benefits, "[w]ere you discharged or suspended as a result of a rule violation[.]" (C.R. at 008-09.) Thus, the Court will not consider whether a rule or policy violation occurred here.

Instead, the Board focused on Claimant's continued delegation of tasks to the assistant manager **despite knowing** that the assistant manager's job performance was deficient relating to, among other tasks, setting the alarm that would warn of a residual chlorine level higher than allowed by the NPDES permit and managing high flow events. As previously discussed, our Supreme Court has held that "willful misconduct" means, in part, a "disregard for standards of behavior which an employer can rightfully expect of an employee[.]" *Navickas*, 787 A.2d at 288. It is on this basis that the Board determined that Claimant's actions amounted to willful misconduct. Specially, the Board found that

> [C]laimant acknowledged that it was his job to manage operations and ensure NPDES compliance. Thus, the fact that the [C]laimant continued to allow the assistant manager to manage the high-flow events without additional oversight is behavior **which falls below the standard of conduct that an employer has a right to expect of employees.**

(Board's Order, C.R. at 101 (emphasis added).)

Our review of the record reveals that the Board's findings that Claimant's continued delegations of tasks, including monitoring and setting alarm levels over

9

which he had ultimate responsibility, to the assistant manager, whose performance Claimant knew to be deficient and which resulted in two violations of Employer's NPDES permit, are supported by substantial evidence. (FOF ¶¶ 7, 10-11, 15, 17-18, 20.) Claimant answered in the affirmative when the Referee asked him whether, as Project Manager, he was responsible for "manag[ing] the operators to comply with the parameters of the NPDES permits," "installing the alarms for the operators," and inspecting the alarms. (C.R. at 063, 065.) Following the first violation, Claimant was instructed by Regional Manager to have alarms installed for the operators to monitor the chlorine residual levels. (*Id.*) Claimant testified that an outside contractor installed the alarms, and that they were set by the assistant manager. (*Id.*) Claimant, however, inspected the alarms and was aware that they were set at 3.5 mg/L, higher than the maximum level permitted, which was 1.6 mg/L. (*Id.* at 065-66.) At the time of the third violation, when Claimant was asked whether he was "responsible for closely monitoring or supervising the operator," he answered no because he "delegate[d] those duties to [his] [a]ssistant [m]anager." (*Id.* at 068.) We note that Claimant provided conflicting testimony regarding his responsibility for managing the operators' compliance with the parameters of the NPDES permits, first stating it was his responsibility and later saying it was not. In finding that it was Claimant's responsibility, (FOF ¶ 4), the Board credited Claimant's initial testimony. When the Referee asked Claimant whether he "had some issues with what the [a]ssistant [m]anager [was] doing related to these incidents," he responded, "that [is] correct," but that "they [sic] are experienced . . . in these high flow events" and that "to their [sic] credit, they [sic] still have to monitor the operators that are performing the duty." (*Id.* at 068.)

In turn, Regional Manager testified that he attributed the second NPDES permit violation to Claimant because, following the first violation, Regional Manager instructed Claimant "to have an alarm installed to warn operators if the residual were to be exceeded." (*Id.* at 057.) Further, Regional Manager testified that he attributed the third violation to Claimant because, following the previous two incidents and communications between Claimant and Employer relating to Claimant's poor work performance, "the expectation would have been that [Claimant] would have been closely supervising the operator to prevent another incident." (*Id.*) Regional Manager testified that, prior to Claimant's discharge, he provided a written warning to Claimant about Claimant's poor work performance on March 7, 2020. (*Id.* at 060.) Regional Manager also testified that he met with the Claimant, that they discussed an action plan relating to programming changes with Employer's chlorine control system, and that Claimant was informed that this was his highest priority. (*Id.*) Regional Manager explained that, ultimately, because Claimant did not follow the action plan in a timely manner, Claimant was discharged. (*Id.*)

The relevant inquiry for us is not whether the record contains evidence to support findings other than those made, but whether there is evidence to support the findings actually made. *Ductmate*, 949 A.2d at 342. The Board credited much of the above testimony, with the exception of Claimant's denial of responsibility over the operators. Reviewing the credited testimony, a reasonable mind could accept it as sufficient to support the Board's findings. Despite Claimant's acknowledgement that it was his job to manage operations and ensure NPDES compliance and that the assistant manager's work performance was deficient, he continued to delegate duties to the assistant manager relating to management of the

11

high flow events and the setting and monitoring of alarms, without additional oversight, which led to additional NPDES permit violations. Thus, the findings of fact are supported by substantial evidence.

The credited evidence shows that Claimant continued to delegate tasks to the assistant manager, and that Claimant knew the assistant manager was performing deficiently and set the alarms at a level higher than permitted, which ultimately led to the two additional NPDES permit violations. Thus, the Board did not err in concluding that these actions of Claimant rose to the level of misconduct because this evinces behavior that falls below the standard Employer had the right to expect. We have previously determined that a supervisor may be guilty of misconduct where the findings of fact reflect the supervisor's knowledge of a supervisee's willful misconduct and "some act or omission [by the supervisor] in light of that knowledge." *Blake v. Unemployment Comp. Bd. of Rev.*, 425 A.2d 43, 46 (Pa. Cmwlth. 1981).

For example, in *BK Foods, Inc. v. Commonwealth of Pennsylvania, Unemployment Compensation Board of Review*, 547 A.2d 873 (Pa. Cmwlth. 1988), we affirmed the Board's decision that a claimant was not ineligible for benefits based on his assistant manager's failure to perform delegated duties based on the claimant's lack of knowledge of that failure. *Id.* at 876. The Court first determined that while "[t]he record . . . establishe[d] . . . that [the e]mployer had a policy that managers were ultimately responsible for seeing [that] bank deposits were made daily; it d[id] not establish . . . that [the claimant] had to take the deposits to the bank personally." *Id.* at 875. We then turned to the issue of whether the claimant had knowledge of the assistant manager's failure to make the deposit, and ultimately determined that the claimant had no such knowledge. *Id.*

12

Subsequent to the claimant's delegation of the duty to make the deposits, "[t]he assistant manager . . . had the duty to make the restaurant's bank deposits and log the amount of the deposits from the deposit slips." *Id.* However, the assistant manager did not make the bank deposit because he could not find the previous day's deposit slips, which were hidden, and he failed to relay to the claimant that these deposit slips were missing. *Id.* Thus, the claimant had no knowledge that the deposit had not been made. *Id.* In arguing that the claimant was not eligible for benefits, the employer asserted that "even if it did not have a policy, [the c]laimant's conduct disregarded standards of behavior which [the e]mployer had a right to expect, and thus, constituted willful misconduct." *Id.* at 876. We did not agree, stating that, "[a]t best all [e]mployer has shown here was negligence. . . . [F]or a negligent act to constitute willful misconduct, the employer must show that employee's negligent act evidences . . . substantial disregard for employer's interest or employee's duties." *Id.* (citing *Fusaro v. Unemployment Comp. Bd. of Rev.*, 483 A.2d 1013 (Pa. Cmwlth.1984)).

Distinguishably, and as previously noted, Claimant possessed both knowledge that the assistant manager set the alarms in excess of the maximum permitted limit, and as such was performing deficiently relating to the high flow events and resulting in a NPDES permit violation, **and** continued to delegate tasks to the assistant manager, resulting in subsequent NPDES permit violations and Claimant's eventual discharge. Based on the foregoing, we conclude that the Board's factual findings support the legal conclusion that Claimant's conduct fell below the standard Employer had a right to expect. As such, there was no error in the Board concluding that Claimant's conduct amounted to willful misconduct.

13

Claimant also argues that, even if his conduct amounted to willful misconduct, substantial evidence does not support the Board's finding, and the Board erred in concluding as a matter of law that he did not have good cause for his actions because of the "necessity of delegation" and "the goals of the alarm system[.]" (Claimant's Br. at 20.) An "employee's behavior cannot fall within 'wil[l]ful misconduct' if it was justifiable or reasonable under the circumstances, since it cannot then be considered to be in wil[l]ful disregard of conduct the employer 'has a right to expect.'" *McLean*, 383 A.2d at 535 (citing *Frumento v. Unemployment Comp. Bd. of Rev.*, 351 A.2d 631, 634 (Pa. 1976)). "In other words, if there was 'good cause' for the employee's action, it cannot be charged as wil[l]ful misconduct." *Id.* A claimant bears the burden of demonstrating that he had good cause for his conduct. *Dillon v. Unemployment Comp. Bd. of Rev.*, 68 A.3d 1054, 1060 (Pa. Cmwlth. 2013) (citing *Docherty v. Unemployment Comp. Bd. of Rev.*, 898 A.2d 1205, 1208 (Pa. Cmwlth. 2006)).

We first observe that while the Board made no express findings as to a lack of good cause, we interpret the Board's rejection of Claimant's testimony explaining his actions in favor of Regional Manager's testimony and finding Claimant ineligible for benefits as implicitly finding as much. Upon review, we conclude that there is no credited testimony in the record that delegation of tasks was necessary or that the goals of the alarm system were achieved by Claimant having the alarms set at 3.5 mg/L, in excess of the maximum permitted NPDES level of 1.6 mg/L.

Here, Claimant testified before the Referee about the numerous conditions that needed to be considered when setting the chlorine monitoring system, that the alarms were set at 3.5 mg/L as part of a "[trial] run," that he knew that the

14

maximum chlorine residual limit pursuant to the NPDES permit was 1.6 mg/L, and that the purpose of the trial run was to avoid a filter backwash that would not maintain chlorine while discharging the waste. (C.R. at 066-067.) In contrast, Regional Manager testified that the purpose of the alarms is to warn the operators of potential issues, that the alarms do not monitor the chlorine residual feed, and that there would be no harm in the alarms being set too low. (*Id.* at 072.) Thus, on the purpose of the alarm levels, Claimant and Regional Manager offered conflicting testimony, and the Board credited Regional Manager's testimony over that of Claimant. (Board's Order, C.R. at 101.) Additionally, Claimant's own testimony is conflicting. Claimant testified about the need for delegation, but also testified that he was ultimately responsible for overseeing the operations of the facility and, in part, managing staff to comply with the parameters of permits issued. Despite Claimant's own testimony regarding his responsibility, he testified that he continued to delegate duties to the assistant manager he knew to be performing deficiently relating to the high flow events that resulted in the NPDES permit violations. Even if Claimant's testimony was not conflicting, the Board still possessed the authority, as the fact finder, to reject Claimant's testimony in whole or in part. *See Stockdill v. Unemployment Comp. Bd. of Rev.*, 368 A.2d 1341, 1343 (Pa. Cmwlth. 1977) ("[W]e cannot say the Board erred, as it was clearly free to reject [the] [c]laimant's uncontradicted statements if it deemed them not credible.")

In arguing that he had good cause for his actions, Claimant is essentially asking this Court to reassess the credibility of the witnesses and believe his testimony over that of Regional Manager, which we do not have the authority to do. As noted above, the Board is the ultimate fact-finder and is charged with resolving conflicts in evidence and making credibility determinations. *Ductmate*,

15

949 A.2d at 342. Because the Board chose to credit the testimony of Regional Manager over Claimant's testimony, Claimant necessarily could not establish that his actions were justifiable and reasonable under the circumstances so as to be found eligible for benefits.

For the foregoing reasons, we conclude that the findings of fact are supported by substantial evidence and that Employer met its burden demonstrating that Claimant was discharged for willful misconduct. To the extent the Board's decision is read as finding that Claimant did not establish good cause for his actions, we conclude that Claimant could not meet his burden of demonstrating good cause for his conduct based on the rejection of his testimony. Therefore, the Board did not err in finding Claimant ineligible for UC benefits pursuant to Section 402(e) of the Law. Accordingly, we affirm the Board's Order.

_____
**RENÉE COHN JUBELIRER,** President Judge

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Andre Fletcher,                       :

                 Petitioner        :

                                :

            v.                    :    No. 533 C.D. 2021

                                :

Unemployment Compensation      :

Board of Review,                 :

                Respondent     :

# **O R D E R**

**NOW**, October 4, 2022, the March 11, 2021 Order of the Unemployment Compensation Board of Review is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge